Chief Justice TOAL.
I respectfully dissent. In my view, the court of appeals did not err in upholding the trial court’s refusal to quash the indictment. Furthermore, I would find that the trial court did not err qualifying a police officer as an expert in forensic interviewing. Thus, I would affirm Petitioner’s convictions for lewd act.
I. Indictments
“The indictment is a notice document.” State v. Gentry, 363 S.C. 93, 102-03, 610 S.E.2d 494, 500 (2005). As such,
[T]he circuit court should judge the sufficiency of the indictment by determining whether (1) the offense is stated with sufficient certainty and particularity to enable the court to *593 know what judgment to pronounce, and the defendant to know what he is called upon to answer and whether he may plead an acquittal or conviction thereon; and (2) whether it apprises the defendant of the elements of the offense that is intended to be charged.
Id. (citation omitted); see also S.C.Code Ann. § 17-19-20 (2003) (“Every indictment shall be deemed and judged sufficient and good in law which, in addition to allegations as to time and place, as required by law, charges the crime substantially in the language of the common law or of the statute prohibiting the crime or so plainly that the nature of the offense charged may be easily understood.... ”). Thus, “an indictment passes legal muster when it charges the crime substantially in the language of the statute prohibiting the crime or so plainly that the nature of the offense charged may be easily understood.” State v. Tumbleston, 376 S.C. 90, 98, 654 S.E.2d 849, 853 (Ct.App.2007).
Generally, when an indictment is challenged based on an overly broad time period, our courts have considered whether time is a material element of the offense and whether the time period covered by the indictment occurred prior to the return of the indictment by the grand jury. Id. at 98-99, 654 S.E.2d at 853-54.
In State v. Wade, this Court unequivocally refused to adopt a per se rule of overbreadth for the mere fact that the time period covered in the indictment is lengthy. 306 S.C. 79, 85, 409 S.E.2d 780, 783 (1991). That case, like this case, involved allegations of sexual abuse perpetrated upon a minor who could not remember the exact dates that her uncle molested her. Id. at 84, 409 S.E.2d at 783. Thus, the indictment included a time period spanning two years. Id. at 81, 409 S.E.2d at 781. To determine whether the petitioner was prejudiced by this lengthy time period, the Court declared it would examine the “ ‘surrounding circumstances’ that existed pre-trial, in order to determine whether a given defendant has been ... taken by surprise and hence [is] unable to combat the charges against him,” and not the mere fact that the indictment covers a longer time frame. Id. at 86, 409 S.E.2d at 784.
*594 Thus, the coverage of six years in these indictments does not necessarily require a finding of overbreadth; accordingly, I analyze each of the factors explicated in our precedents in turn.
First, the language of the indictment substantially tracks the statutory language such that Petitioner was on notice of the charges he faced. Section 16-15-140 of the South Carolina Code, defining lewd act, provides:
It is unlawful for a person over the age of fourteen years to willfully and lewdly commit or attempt a lewd or lascivious act upon or with the body, or its parts, of a child under the age of sixteen years, with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of the person or of the child.
S.C.Code Ann. § 16-15-140 (2003 & Supp.2012). In comparison, the amended indictments for lewd act state:
That [Petitioner], a person over the age of fourteen (14) years, did in Sumter County between the period of June 1, 1998 and September 1, 2004 violate Section 16-15-140 of the Code of Laws of South Carolina ... in that ... [Petitioner] did willfully and lewdly commit or attempt to commit a lewd and lascivious act upon or with the body, or any part or member thereof, of a child under the age of sixteen (16) years, to wit: [Victim 1] ..., with the intent of arousing, appealing to, or gratifying the lust, passions or sexual desires of himself or of the said child.[6]
Likewise, section 16-3-655 of the South Carolina Code, defining CSC with a Minor-Second, provides:
(B) A person is guilty of criminal sexual conduct with a minor in the second degree if: (1) the actor engages in sexual battery with a victim who is fourteen years of age or less but who is at least eleven years of age; or (2) the actor engages in sexual battery with a victim who is at least fourteen years of age but who is less than sixteen years of age and the actor is in a position of familial, custodial, or official authority to coerce the victim to submit or is older than the victim.
*595 S.C.Code Ann. § 16-3-655 (Supp.2007).[7] Petitioner’s CSC with a Minor-Second indictment states:
That [Petitioner] did in Sumter County between the period of June 1, 2004 and September 1, 2004, willfully and unlawfully commit criminal sexual conduct with a minor in the second degree by engaging in sexual battery with a minor who was at least fourteen (14) years of age but who was less than sixteen (16) years of age, to wit: [Victim 1] ... and the actor was in a position of familial, custodial, or official authority to coerce the victim to submit or was older than the victim, to wit: vaginal digital intrusion and cunnilingus, in violation of Section 16-3-655(3) of the Code of Laws of South Carolina....
Because time is not an element of the offenses, and because the time period covered by the indictments occurred prior to the return of the indictments by the grand jury, we must look to the surrounding circumstances leading to the enlargement of time in the indictments. Tumbleston, 376 S.C. 90, 101-02, 654 S.E.2d 849, 855 (“Indeed, indictments for a sex crime that allege offenses occurred during a specified time period are sufficient when the circumstances of the case warrant considering an extended time frame.” (internal citations omitted)). To this end, the dates were extended in response to the child victims’ collective recollection that the abuse began before the birth of their sister (in 1998) after viewing their aunt’s scrapbook, but after the grand jury returned the initial indictments. Thus, these circumstances warranted broadening the time period to cover the years in which the abuse allegedly occurred (1998 until 2004), and under our existing framework, the indictments should be upheld.
However, the majority focuses on the date the amended indictments were returned by the grand jury on October 26, 2006, in relation to the date the case was called for trial on November 13, 2006, to support its finding that the indictments were insufficient. In so holding, the majority erroneously conflates the concepts of notice and preparation.
*596 In my opinion, Petitioner’s ability to prepare a more robust defense does not remotely figure into the notice paradigm. For this reason, the majority’s focus on whether Petitioner had the opportunity to develop an alibi defense is completely inappropriate (and not just because Petitioner did not raise that argument himself). To me, such concerns are better addressed in a motion for trial continuance, which, incidentally, counsel for Petitioner filed for this exact reason in light of the enlarged scope of the indictments. For whatever reason, the motion was denied. Although Petitioner raised the propriety of the denial of this motion to the court of appeals (which affirmed), Petitioner has not raised the denial of the continuance to this Court. Thus, in my view, this was not a proper consideration on appeal.
More importantly, I think today’s precedent will gravely restrict the State’s ability to prosecute child sex abuse cases. Here, as in most cases of child sex abuse, the State was attempting to prosecute numerous, covert sexual encounters occurring over the course of many years. Our appellate courts have heretofore been careful to fashion a rule which takes the relative immaturity, lack of sophistication, and trauma suffered by child victims into account, and has sought to balance these considerations with the court’s obligation to also protect the constitutional rights of the criminal defendant. See, e.g., Tumbleston, 376 S.C. at 102, 654 S.E.2d at 855 (“The stealth and repetitive nature of the alleged conduct compels identification of the broader time period. The victim is a young child, whom one cannot reasonably expect to recall the exact dates of the sexual abuse.”). I fear that today’s ruling will greatly hinder the State’s ability to bring future perpetrators to justice, as it is often impossible for a child to recall the exact date(s) he or she was abused. We have never required exacting specificity when upholding an indictment in this scenario before, and in my opinion, it is a mistake to add such a requirement now.
Without a doubt, these indictments put Petitioner on notice of what charges he was “called upon to answer” and apprised him of the elements of the offenses the State intended to charge. Gentry, 363 S.C. at 102-03, 610 S.E.2d at 500. This is all that the law required.
*597 Accordingly, I would affirm the court of appeals’ decision upholding the circuit court’s denial of Petitioner’s motion to quash the indictments.
II. Expert Testimony
Furthermore, I would find that while the trial court erred in qualifying Herod, a victim’s assistance officer, the admission of this testimony did not cause prejudice to Petitioner.
During trial, both girls testified against Petitioner. In addition, the State sought to qualify Gwen Herod as an expert in forensic interviewing and assessment of child abuse. The trial court conducted an in camera hearing to determine Herod’s qualifications. Herod testified that she has been employed with the Sumter County Sheriffs Office since 1998 as a victim assistance officer. As part of her duties, Herod conducts forensic interviews of child victims of sexual abuse, usually at the behest of the investigating officer.
The circuit court allowed the State to proffer Herod’s testimony to determine whether she was qualified as an expert in the field of forensic interviewing. Herod stated that she is a certified forensic interviewer due to her training, which involved taking two one-week courses sponsored by the American Prosecutors Research Institute (APRI). Herod testified she obtained certification in 2001 after passing a written examination and conducting a mock interview under observation. In 2003, Herod attended another advanced week-long APRI course. Herod further testified that she is certified on a state and national level as a victim assistance specialist, and is a member of APRI, the National Organization for Victim Assistance, the South Carolina Law Enforcement Victim Advocate Association, the National Sheriffs’ Association Victim Advisory Board, and the South Carolina Victim Assistance Network Advisory Board. Through the National Sheriffs’ Association, she has trained other advocates across the nation. Under cross-examination, Herod acknowledged that she did not belong to an “association of forensic interviewers,” she lacked a college degree, and her formal training was limited to the two APRI courses. Nevertheless, over Petitioner’s objection, the circuit court qualified Herod as an expert in forensic interviewing.
*598 Before the jury, Herod restated her background, and the circuit court again qualified her as an expert in forensic interviewing. Herod testified that since 2001, she has utilized the Rapport, Anatomy Identification, Touch Inquiry, Abuse Scenario, and Closure (RATAC) method to conduct forensic interviews of child victims of sexual abuse. Herod testified that in the “Rapport” stage, the interviewer “open[s] communication lines” with the child to “mak[e] the child feel at ease.” Herod stated further that in this stage, the interviewer “also assess[es] the child, insuring that ... that they’re able to ... to participate in the interview in a satisfactory way and ... explain[s] to the child who [the interviewer is] and what [her] role is.” In the “Anatomy Identification” stage, the interviewer shows pictures of the male and female anatomy to the child to ensure that she understands what body parts the child is describing, and explains to the child that he or she may use these pictures to circle and identify body parts throughout the interview. In the “Touch Inquiry” stage, Herod testified that the interviewer asks the child about the types of touching that the child deems acceptable, and the touches that make the child uncomfortable. In the “Abuse Scenario” stage, the child is asked to tell the interviewer about the circumstances of the abuse, and other information deemed necessary to the investigation. Finally, Herod testified that in the “Closure” stage, the interviewer ensures the child does not have any questions before ending the interview.
Herod testified that she conducted an interview with Victim 1 on October 21, 2004, using the RATAC method. During her testimony, Herod relayed that Victim 1 told her that the abuse occurred at her aunt and uncle’s home in Sumter County during the summer months but that she could not recall the specific years of the abuse. Based on the interview, Herod recommended Victim 1 receive a medical exam. Herod also conducted a forensic interview with Victim 2 on the same date, and she denied being sexually abused by Petitioner at that time. During a follow-up meeting with the family, Victim 2 disclosed that Petitioner had abused her also, which prompted Herod to again meet with Victim 2 on June 26, 2006, to discuss the allegations. At the time, Victim 2 was unable to give an exact date for the alleged abuse, but later identified a time frame.
*599 Under cross-examination, defense counsel questioned Herod about the particular stages, and in regards to the Rapport stage, questioned Herod about her assessment of whether the child is telling the truth. In response, Herod stated that “we talk about [the importance of telling the truth] and I’m also assessing whether the child can even differentiate between the truth and a lie .... [b]ut we talk about the truth and the importance of it.”
“The qualification of an expert witness and the admissibility of the expert’s testimony are matters within the trial court’s discretion.” Gooding v. St. Francis Xavier Hosp., 326 S.C. 248, 252, 487 S.E.2d 596, 598 (1997) (citation omitted). An appellate court will not disturb the trial judge’s determination regarding a witness’s qualifications to testify as an expert absent a showing of an abuse of discretion. State v. Schumpert, 312 S.C. 502, 505, 435 S.E.2d 859, 861 (1993) (citation omitted); State v. Henry, 329 S.C. 266, 273, 495 S.E.2d 463, 466 (Ct.App.1997). “An abuse of discretion occurs when there is an error of law or a factual conclusion which is without evidentiary support.” Gooding, 326 S.C. at 252, 487 S.E.2d at 598 (citation omitted).
Rule 702, SCRE, which governs the admission of expert testimony, provides:
If scientific technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
To be competent to testify as an expert, “a witness must have acquired by reason of study or experience or both such knowledge and skill in a profession or science that he is better qualified than the jury to form an opinion on the particular subject of his testimony.” Gooding, 326 S.C. at 253, 487 S.E.2d at 598 (citation omitted). “Expert testimony differs from lay testimony in that an expert witness is permitted to state an opinion based on facts not within his firsthand knowledge or may base his opinion on information made available before the hearing so long as it is the type of information that is reasonably relied upon in the field to make opinions.” Watson v. Ford Motor Co., 389 S.C. 434, 445-46, *600 699 S.E.2d 169, 175 (2010) (citing Rule 703, SCRE). Defects in an expert witness’s education and experience go to the weight, rather than the admissibility, of the expert’s testimony. Gooding, 326 S.C. at 253, 487 S.E.2d at 598 (citation omitted).
In State v. Kromah, we stated that we could “envision no circumstance where [a forensic interviewer’s] qualification as an expert at trial would be appropriate.” 401 S.C. 340, 357 n. 5, 737 S.E.2d 490, 499 n. 5 (2013); cf. State v. Douglas, 380 S.C. 499, 505, 671 S.E.2d 606, 609-10 (2009) (Pleicones, J., dissenting) (“[I]t was not only unnecessary but improper for the circuit court to qualify Herod as an expert witness” as “[t]his Court’s jurisprudence and Rule 702 of the South Carolina Rules of Evidence emphasize the role of the trial court as the gatekeeper in determining, among other things, whether the expert’s testimony consists of scientific, technical, or specialized knowledge that will assist the trier of fact.” (citations omitted)).
Of course, the trial judge in the instant case did not have the benefit of the Kromah decision. While the majority did not address this issue in full, I take issue with its reliance on Kromah. See Kromah, 401 S.C. at 357 n. 5, 737 S.E.2d at 499 n. 5. The facts of Kromah were categorically different from the facts here, and I would hold that Herod’s qualification as an expert was harmless beyond a reasonable doubt. See id., 401 S.C. at 360, 737 S.E.2d at 501.
Here, Herod never testified on direct examination about the victims’ credibility. The only time her testimony could be construed to touch on the victims’ credibility occurred while under cross-examination by Petitioner’s counsel:
Q: In regards to the ... [Rjapport stage, part of what you emphasize to them is the importance of telling the truth don’t you?
A: Yes, sir. We talk about that and I’m also assessing whether the child can even differentiate between the truth and a lie.
Q: Okay.
A: But we talk about the truth and the importance of it.
Q: Right.
*601 A: Yes, sir, I did.
Q: Okay. And you also did a forensic interview of [Victim 2] at that time, is that correct?
A: After [Victim 1].
Q: After [Victim 1].
A: The same day.
Q: Both of those occurred on October 21st, 2004, right?
A: That’s correct.
Q: When you ... when you did the forensic interview on [Victim 1] you emphasized to her in that standardized portion the importance of telling the truth, didn’t you?
A: Yes, sir, I do in ever[y] interview.
Q: Okay. And you did it then ... if you did it with every interviewf,] you did it with [Victim 2].
A: I did.
In my opinion, the majority should not have relied on Kromah. If Herod in any way improperly bolstered the victims’ credibility, it was because Petitioner raised the issue of Herod’s assessment of the veracity of the child victim in her methodology. Therefore, he cannot now complain that it was error. See State v. Robinson, 305 S.C. 469, 474, 409 S.E.2d 404, 408 (1991) (finding where “petitioner opened the door to ... evidence, he cannot complain of prejudice from its admission”). The focus in Kromah was on testimony that improperly bolstered the child victim’s testimony. To the extent the forensic interviewer’s testimony does not touch on credibility, there is no reversible error.
In my opinion, while the circuit court should not have qualified Herod as an expert, any error resulting from the inclusion of her testimony was harmless beyond a reasonable doubt.
III. Conclusion
For the foregoing reasons, I would affirm the court of appeals’ decision upholding the circuit court’s refusal to quash the indictments, and finding Petitioner suffered no prejudice *602 despite Herod’s qualification as an expert in forensic interviewing.
KITTREDGE, J., concurs.

. The indictment for count five of lewd act involving Victim 2 is substantially similar, but Petitioner was acquitted of that charge.

. Because Appellant was indicted on July 20, 2006, we cite to the section and language effective at the time of the indictments. Compare S.C.Code Ann. § 16-3-655 (Supp.2007), with S.C.Code Ann. § 16—3—655 (Supp.2012).