628 S.E.2d 262

**Kathleen L. GADSON, Employee, Respondent,**

**v.**

**MIKASA CORPORATION, Employer, The Yasuda Fire & Marine Insurance Co., Carrier, Appellants.**

**No. 4083.**

Court of Appeals of South Carolina.

Heard Feb. 6, 2006.
Decided Feb. 21, 2006.
Rehearing Denied April 20, 2006.

---

216

218

Duke K. McCall, Jr., of Greenville, for Appellants.

Thomas M. White, of Goose Creek, for Respondent.

ANDERSON, J.:

In this Workers' Compensation case, the employer, Mikasa Corporation, and its insurance carrier, The Yasuda Fire & Marine Insurance Company (collectively referred to as Mikasa) appeal the circuit court's affirmance of the appellate panel's ruling that Kathleen L. Gadson had reached maximum medical improvement and was entitled to permanent disability benefits. We affirm.

### *FACTUAL/PROCEDURAL BACKGROUND*

In September of 1997, Kathleen Gadson began working for Mikasa in Charleston, South Carolina. On January 8, 1998, Gadson sustained an injury by accident arising out of and in the course of her employment. She was injured while unloading some boxes. Since January of 1998, Dr. Jeffrey K. Wingate, a spine surgeon with the Carolina Spine Institute, has been her primary treating physician. The single commissioner found Gadson had injuries to her abdomen and lower back. She was awarded temporary total disability and permanent partial disability of ten percent for loss of use and disability to her back.

Subsequently, Gadson filed a Form 50 alleging a material change in her condition and requesting additional benefits.

The single commissioner found that Gadson had experienced a material change in her condition entitling her to additional benefits under S.C.Code Ann. § 42–17–90. Mikasa was required to be responsible for Dr. Wingate's medical bills and to provide medical care through Dr. Wingate. The appellate panel affirmed the single commissioner.

Following two surgical procedures by Dr. Wingate and the assignment of a permanent impairment rating, Gadson filed a Form 50 alleging that she had reached maximum medical improvement (MMI), was permanently and totally disabled, and was entitled to lifetime medical care. The single commissioner ruled that Gadson was at maximum medical improvement as of May 22, 2002. The commissioner further found that Gadson was permanently and totally disabled under S.C.Code Ann. § 42–9–30. Mikasa appealed asserting that Gadson had not reached MMI and that further medical care and treatment would tend to lessen her period of disability. The appellate panel unanimously affirmed the single commissioner's order in its entirety. The circuit judge affirmed the appellate panel, concluding there was substantial evidence in the record to support the panel's findings.

## STANDARD OF REVIEW

The South Carolina Administrative Procedures Act (APA) establishes the standard for judicial review of decisions of the Workers' Compensation Commission. *Lark v. Bi–Lo, Inc.*, 276 S.C. 130, 276 S.E.2d 304 (1981); *Hargrove v. Titan Textile Co.*, 360 S.C. 276, 599 S.E.2d 604 (Ct.App.2004). A reviewing court may reverse or modify a decision of an agency if the findings, inferences, conclusions, or decisions of that agency are "clearly erroneous in view of the reliable, probative and substantial evidence on the whole record." *Bass v. Kenco Group*, 366 S.C. 450, 457, 622 S.E.2d 577, 580 (Ct.App.2005); S.C.Code Ann. § 1–23–380(A)(6)(e) (2005). Under the scope of review established in the APA, this Court may not substitute its judgment for that of the appellate panel as to the weight of the evidence on questions of fact, but may reverse where the decision is affected by an error of law. *Liberty Mut. Ins. Co. v. South Carolina Second Injury Fund*, 363 S.C. 612, 611 S.E.2d 297 (Ct.App.2005); S.C.Code Ann. § 1–23–380(A)(6)(d) (2005).

■ The substantial evidence rule of the APA governs the standard of review in a Workers' Compensation decision. *Frame v. Resort Servs., Inc.*, 357 S.C. 520, 593 S.E.2d 491 (Ct.App.2004); *Corbin v. Kohler Co.*, 351 S.C. 613, 571 S.E.2d 92 (Ct.App.2002); *see also Lockridge v. Santens of America, Inc.*, 344 S.C. 511, 515, 544 S.E.2d 842, 844 (Ct.App.2001) ("Any review of the commission's factual findings is governed by the substantial evidence standard."). Pursuant to the APA, this Court's review is limited to deciding whether the appellate panel's decision is unsupported by substantial evidence or is controlled by some error of law. *See Rodriguez v. Romero*, 363 S.C. 80, 610 S.E.2d 488 (2005); *Gibson v. Spartanburg Sch. Dist. # 3*, 338 S.C. 510, 526 S.E.2d 725 (Ct.App. 2000); S.C.Code Ann. § 1–23–380(A)(6) (2005); *see also Grant v. Grant Textiles*, 361 S.C. 188, 191, 603 S.E.2d 858, 859 (Ct.App.2004) ("A reviewing court will not overturn a decision by the Workers' Compensation Commission unless the determination is unsupported by substantial evidence or is affected by an error of law."). Substantial evidence is not a mere scintilla of evidence, nor the evidence viewed blindly from one side of the case, but is evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion the administrative agency reached in order to justify its action. *Pratt v. Morris Roofing, Inc.*, 357 S.C. 619, 594 S.E.2d 272 (2004); *Jones v. Georgia–Pacific Corp.*, 355 S.C. 413, 586 S.E.2d 111 (2003).

■ The appellate panel is the ultimate fact finder in Workers' Compensation cases and is not bound by the single commissioner's findings of fact. *Bass v. Isochem*, 365 S.C. 454, 617 S.E.2d 369 (Ct.App.2005); *Muir v. C.R. Bard, Inc.*, 336 S.C. 266, 519 S.E.2d 583 (Ct.App.1999). The final determination of witness credibility and the weight to be accorded evidence is reserved to the appellate panel. *Shealy v. Aiken County*, 341 S.C. 448, 535 S.E.2d 438 (2000); *Frame*, 357 S.C. at 528, 593 S.E.2d at 495. The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. *Sharpe v. Case Produce, Inc.*, 336 S.C. 154, 519 S.E.2d 102 (1999); *DuRant v. South Carolina Dep't of Health & Envtl. Control*, 361 S.C. 416, 604 S.E.2d 704 (Ct.App.2004). Where there are conflicts in the evidence over

a factual issue, the findings of the appellate panel are conclusive. *Etheredge v. Monsanto Co.*, 349 S.C. 451, 562 S.E.2d 679 (Ct.App.2002).

The findings of an administrative agency are presumed correct and will be set aside only if unsupported by substantial evidence. *Anderson v. Baptist Med. Ctr.*, 343 S.C. 487, 541 S.E.2d 526 (2001); *Hicks v. Piedmont Cold Storage, Inc.*, 335 S.C. 46, 515 S.E.2d 532 (1999). It is not within our province to reverse findings of the appellate panel which are supported by substantial evidence. *Broughton v. South of the Border*, 336 S.C. 488, 520 S.E.2d 634 (Ct.App.1999).

## *LAW/ANALYSIS*

### I. Maximum Medical Improvement

Mikasa argues the circuit court erred in affirming the appellate panel's finding that "Gadson had reached MMI and that she was totally and permanently disabled." Mikasa claims this ruling is not supported by substantial evidence. We disagree.

Maximum medical improvement is a term used to indicate that a person has reached such a plateau that in the physician's opinion there is no further medical care or treatment which will lessen the degree of impairment. *Bass v. Kenco Group*, 366 S.C. 450, 622 S.E.2d 577 (Ct.App.2005); *Lee v. Harborside Café*, 350 S.C. 74, 564 S.E.2d 354 (Ct.App.2002). However, the fact that a claimant has reached MMI does not preclude a finding the claimant still may require additional medical care or treatment. *Dodge v. Bruccoli, Clark, Layman, Inc.*, 334 S.C. 574, 514 S.E.2d 593 (Ct.App.1999).

If an employee has reached MMI and remains disabled, then his injury is permanent. *Smith v. South Carolina Dep't of Mental Health*, 335 S.C. 396, 517 S.E.2d 694 (1999). When a claimant receiving temporary benefits reaches MMI and is still disabled, temporary benefits are terminated and the claimant is awarded permanent benefits. *Smith*, 335 S.C. at 399, 517 S.E.2d at 696; *Bass*, 366 S.C. at 467, 622 S.E.2d at 585. Once the commission affirms a finding of MMI, it is appropriate to terminate temporary benefits in

favor of permanent disability benefits, if warranted by the evidence. *Smith,* 335 S.C. at 399, 517 S.E.2d at 696.

Dr. Wingate was Gadson's authorized treating physician. Gadson was seen by Dr. Wingate on May 7, 2002 "as a worsening of condition for her low back pain." Prior to that date, she had been last seen on September 14, 2001, when she was having continuing low back and radiating left leg pain. The CT scan from March 25, 2002 showed a solid bony union at L5–S1. In the May 7 note, Dr. Wingate stated that Gadson could consider an L4–5 epidural injection but he doubted she would need any additional surgery.

Gadson returned to Dr. Wingate on May 22, 2002, the date she was determined to be at MMI. Dr. Wingate recommended exercise to manage her symptoms. Dr. Wingate noted he would be happy to see Gadson in the future but declared: "In my opinion she does not need any further surgical intervention or invasive spinal care." Gadson was not given a return appointment.

Defense counsel wrote Dr. Wingate on July 17, 2002, requesting an impairment rating for Gadson. Dr. Wingate responded by letter dated August 15, 2002. He opined:

In my professional opinion, Ms. Gadson has sustained a 30% whole person impairment as a result of the significant injury to her lumbosacral spine, and the ongoing pain, parasthesias and motor weakness that she has to her right lower extremity. I do not feel that she will ever return to gainful employment. She has a sitting and standing intolerance of 15–20 minutes. She also has a severe deconditioning of her spine, and her medical condition in general.

. . . .

Future medical expenses will most probably include the cost of epidural steroid injections, and intermittent physical therapy. . . . She continues to take nonsteroidal anti-inflammatory and muscular relaxant medications, in combination with an antidepressant, which I think is absolutely indicated in clinical terms for her pain syndrome. It is my professional opinion that she will remain on these medications long term at a cost of $200–$250 per month total.

At this point, she has no scheduled follow up visits to return and see me. I have offered her return follow up on a PRN

basis if her low back and right thigh pain intensify to the point that she needs further invasive care. For now she will continue with the conservatively oriented medications. She'll return to see me on a PRN basis. Medical follow up will also include annual CBC, SMA–7 laboratory exams to rule out any damage to kidneys or liver as a result of her medical treatments. She's welcome to see me back for further medical follow up as needed.

Gadson returned to Dr. Wingate on January 9, 2003. She had an escalation in her pain "since [the weather] got cold." Dr. Wingate noted a "change in [Gadson's] overall pain picture." Gadson was "having more intense pain in the low back and down the legs." Dr. Wingate recommended a new MRI scan and wanted to see her after the scan.

Gadson saw Dr. Wingate on January 16, 2003. He reviewed the lumbar MRI scan and noted post-surgical changes at L5–S1. He "doubt[ed] that anything immediately would be needed surgically." Dr. Wingate recommended that Gadson do her back strengthening and stabilization exercises and continue her medications. He asked Gadson to return in two months.

Gadson's last appointment with Dr. Wingate before the hearing was March 19, 2003. Dr. Wingate noted the CT scan showed solid fusion even after the removal of her pedicle screws. He declared: "Unfortunately, I have very little to offer [Gadson]. There is nothing focal on her exam today. She has no new specific nerve pain or specific muscle weakness in either arm or leg." Dr. Wingate suggested Gadson stay on her medication and come back to see him in four to six months. He stated Gadson's primary physician should continue to provide her pain medications.

 There is substantial evidence in the record that Gadson reached MMI as of May 22, 2002, and was totally and permanently disabled. MMI is a factual determination left to the discretion of the appellate panel. On May 22, 2002, Dr. Wingate released Gadson to be seen on a PRN basis. At that time, Dr. Wingate found Gadson had her hardware removed and she was going to need long term narcotics. He did not schedule her for a return appointment. He noted that she had no scheduled follow-up visits. According to Dr. Wingate, Gadson was not a candidate for any further surgical interven-

tion or invasive spinal care, although it was anticipated that she would be having some ongoing medical care to include injections and possibly physical therapy. The continued treatment was nothing more than maintenance care to maintain Gadson's condition. Her last MRI did not reveal that there was any further active medical treatment that could be done. Dr. Wingate gave Gadson an impairment rating. He found Gadson would never be able to return to gainful employment and that she had a severe sitting and standing intolerance of fifteen to twenty minutes. In January of 2003, Gadson had temporal escalation in her pain, which was to be expected. Two months later, Dr. Wingate again noted he had nothing further to offer her. Although Dr. Wingate did not specifically say that Gadson reached MMI, it is obvious from his report that he rated her, did not give her a return appointment and noted that she had permanent impairment and disability that would prevent her from being able to work in the future. Nothing in Dr. Wingate's later notes or records indicates that Gadson was no longer at MMI or that there had been a change in her condition after May 22, 2002.

Mikasa asserts the finding that Gadson reached MMI is unsupported by substantial evidence, primarily because the reports of Dr. Wingate dated January 9, 2003, January 16, 2003, and March 19, 2003 indicate that Gadson "needs further medical treatment so as to lessen her period of disability." This assertion has no merit. As in *Pearson v. JPS Converter & Indus. Corp.*, 327 S.C. 393, 397, 489 S.E.2d 219, 221 (Ct.App. 1997), "additional medical treatment may improve [Gadson's] overall quality of life and ability to cope, but not otherwise impact the finding on maximum medical improvement."

The circuit judge did not err in affirming the appellate panel's finding that Gadson reached MMI as of May 22, 2002, and is totally and permanently disabled.

## II. Vocational Evaluation Consultant

Mikasa maintains the circuit court erred "in its adoption of the Workers' Compensation Commissioner's acceptance of the report of Ms. Jean Hutchinson as an expert under the Administrative Procedures Act without any evidence of her qualifications and/or expertise."

At the hearing before the single commissioner, Gadson submitted a vocational evaluation from Hutchinson, who found that Gadson was totally disabled and unable to work in her present condition. Mikasa objected to the report of Hutchinson. Mikasa averred Hutchinson did "not qualify as an expert to render an opinion in the case." The commissioner overruled Mikasa's objection and admitted the report, noting she would "give it the appropriate weight and certainly in consideration of your objection."

## A. Regulations 67–611 & 67–612

The utilitarian efficacy of admissibility under Workers' Compensation regulations is salutary and salubrious. Historically, the regulations allow for written reports and documentation in lieu of live testimony, concomitantly saving time and expense in the presentation of testimony before the single commissioner.

Regulation 67–611 of the South Carolina Workers' Compensation Commission requires that each attorney representing a party file a Form 58, Pre–Hearing Brief, with the commissioner and serve a copy on the opposing party at least ten days prior to the Workers' Compensation hearing. 25A S.C.Code Ann. Regs. 67–611(B) (Supp.2005); *Morgan v. JPS Automotives,* 321 S.C. 201, 467 S.E.2d 457 (Ct.App.1996). Form 58 requires the filing party to give the names and addresses of the persons known to the parties or counsel to be witnesses. On the Form 58, Gadson typed: "7. Witnesses (designate if expert): *Jean Hutchinson—report to be submitted in lieu of live testimony.*"

Pursuant to Regulation 67–612, it is mandated that a moving party provide the report to the opposing party at least fifteen days before the scheduled hearing. 25A S.C.Code Ann. Regs. 67–612(B)(1) (Supp.2005). Gadson served defense counsel with his Brief and APA submissions on April 3, 2003, nineteen days before the hearing. Regulation 67–612(D) notes: "Any report submitted to the opposing party in accord with (B)(1) [of 67–612] ... shall be submitted as an APA exhibit at the hearing unless withdrawn with the consent of the other party." Included with the Form 58 in the instant case was a listing of all submissions under the APA, including

Hutchinson's report. The regulations allow for a deposition to be taken should any party request it. Here, there was no such request by Mikasa.

▮ Regulations authorized by the legislature have the force of law. *Gaffney Ledger v. South Carolina Ethics Comm'n,* 360 S.C. 107, 600 S.E.2d 540 (2004); *McNickel's, Inc. v. South Carolina Dep't of Revenue,* 331 S.C. 629, 503 S.E.2d 723 (1998); *Goodman v. City of Columbia,* 318 S.C. 488, 458 S.E.2d 531 (1995); *cf.* S.C.Code Ann. § 1–23–10(4) (2005) (defining "Regulation" as "each agency statement of general public applicability that implements or prescribes law or policy or practice requirements of any agency. Policy or guidance issued by an agency other than in a regulation does not have the force or effect of law."). However, regulations may not alter or add to the terms of a statute. *United States Outdoor Advertising, Inc. v. South Carolina Dep't of Transp.,* 324 S.C. 1, 481 S.E.2d 112 (1997).

Hutchinson's report was properly filed as an APA submission and timely served on Mikasa. The regulations allow for APA submissions. Gadson complied with the regulations by giving notice. Further, it was clear from the APA submission and the Brief that the vocational expert would not be testifying live but a report would be submitted in lieu of live testimony. After the service of the Brief on Mikasa, defense counsel made no attempt to depose Hutchinson so as to challenge her credentials or expertise nor did he attempt to subpoena her to the hearing or to subpoena any additional qualifications he may have desired. Mikasa objected to the report at the hearing but made no request to depose Hutchinson at a later date. Moreover, the Administrative Procedures Act, S.C.Code Ann. § 1–23–310, *et seq.,* allows for submission of such a report. Thus, Hutchinson's report was admissible under the APA and Regulations 67–611 and 67–612.

## B. Vocational Expert

Mikasa contends Hutchinson's report should have been excluded because "there is no indication that the individual making th[e] report is qualified as an expert or has the expertise to express the opinions set forth in her ... report." We disagree.

 The qualification of an expert witness and the admissibility of the expert's testimony are matters within the trial court's sound discretion. *Fields v. Regional Med. Ctr. Orangeburg*, 363 S.C. 19, 609 S.E.2d 506 (2005); *Payton v. Kearse*, 329 S.C. 51, 495 S.E.2d 205 (1998). The trial court's decision to admit expert testimony will not be reversed on appeal absent an abuse of discretion. *See Mizell v. Glover*, 351 S.C. 392, 570 S.E.2d 176 (2002); *Ellis v. Davidson*, 358 S.C. 509, 595 S.E.2d 817 (Ct.App.2004).

 The test for qualification of an expert is a relative one that is dependent on the particular witness's reference to the subject. *Wilson v. Rivers*, 357 S.C. 447, 593 S.E.2d 603 (2004). Rule 702, SCRE, articulates guidelines for the admissibility of expert testimony. Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Rule 702, SCRE. There is no abuse of discretion as long as the witness has acquired by study or practical experience such knowledge of the subject matter of his testimony as would enable him to give guidance and assistance to the jury in resolving a factual issue which is beyond the scope of the jury's good judgment and common knowledge. *State v. Henry*, 329 S.C. 266, 495 S.E.2d 463 (Ct.App.1997). For a court to find a witness competent to testify as an expert, the witness must be better qualified than the fact finder to form an opinion on the particular subject of the testimony. *Ellis*, 358 S.C. at 525, 595 S.E.2d at 825. An expert is not limited to any class of persons acting professionally. *Gooding v. St. Francis Xavier Hosp.*, 326 S.C. 248, 487 S.E.2d 596 (1997). There is no exact requirement concerning how knowledge or skill must be acquired. *Honea v. Prior*, 295 S.C. 526, 369 S.E.2d 846 (Ct.App.1988).

 The party offering the expert has the burden of showing the witness possesses the necessary learning, skill, or practical experience to enable the witness to give opinion testimony. *Henry*, 329 S.C. at 274, 495 S.E.2d at 466. Generally, however, defects in the amount and quality of the expert's education or experience go to the weight to be accorded the

expert's testimony and not to its admissibility. *Peterson v. National R.R. Passenger Corp.*, 365 S.C. 391, 618 S.E.2d 903 (2005); *Henry*, 329 S.C. at 274, 495 S.E.2d at 466; *see also Brown v. Carolina Emergency Physicians, P.A.*, 348 S.C. 569, 580, 560 S.E.2d 624, 629 (Ct.App.2001) ("Any defect in the education or experience of an expert affects the weight and not the admissibility of the expert's testimony.").

■■■■ On the cover of the APA submissions, it stated that Hutchinson has a Masters in Education and is submitting a vocational evaluation which was performed on Gadson on October 10, 2002. On page one of Hutchinson's report, she noted that she is a "Vocational Consultant." On page seven of her report, Hutchinson indicated she has a Masters in Education, is a "Certified Rehabilitation Counselor" and is "Certified in Vocational Evaluation."

At the hearing before the circuit judge, Gadson's attorney explained:

As to the report of Jean Hutchinson, I think the Administrative Procedures Act under 1–23–310 clearly allows us to let it in. It's just a question of weight. You don't need Jean Hutchinson's report in this case because the authorized treating physician says she'll never return to work, but the report clearly is admissible. The commissioners can give it what weight they want. **Jean Hutchinson is someone who has appeared in front of them the last twenty years. I've used her the last twenty-five years. So they know who she is.** And her report is—(Emphasis added).

The judge responded: "She's familiar to the Court."

Hutchinson's qualifications are set forth in her report. She was qualified to give an opinion as to Gadson's employability. Any defects in Hutchinson's qualifications go to the weight, not the admissibility, of her report. The appellate panel did not err by admitting Hutchinson's report.

## *CONCLUSION*

Accordingly, we

**AFFIRM.**

HEARN, C.J., and KITTREDGE, J., concur.